```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 6/16/2021
```

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------X
UNITED STATES OF AMERICA,           :
                                    :
                                    :           **20 CR 419(VM)**
           -against-                :           **DECISION & ORDER**
                                    :
MILES CHARLES,                      :
                                    :
                      Defendant.    :
----------------------------------X

**VICTOR MARRERO, U.S.D.J.:**

Defendant Miles Charles ("Charles" or "Defendant") was charged with participating in a conspiracy to distribute cocaine in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A). (See "Indictment," Dkt. No. 5.) Now before the Court is Defendant's motion to dismiss the Indictment on the grounds that the grand jury did not reflect a fair cross section of the community, in violation of the Jury Selection and Service Act of 1968 ("JSSA"), 28 U.S.C. § 1861 et seq., and the Fifth and Sixth Amendments of the United States Constitution. (See Dkt. No. 25.)

In support of his motion, Charles has filed a memorandum of law ("Defense Br.," Dkt. No. 26), which attaches an expert Declaration from Jeffrey Martin ("Martin Decl.," Dkt. No. 26-1). The Court also received the Government's opposition ("Government Br.," Dkt. No. 33), attaching an expert Affidavit from Bernard R. Siskin ("Siskin Aff.," Dkt. No. 33-1). For the reasons set forth below, the Motion is DENIED.

### I.  BACKGROUND

A.  FACTUAL AND PROCEDURAL HISTORY

A complaint was filed against Charles on August 12, 2020, alleging that Charles had attempted to purchase large quantities of cocaine in Manhattan. A grand jury seated in White Plains returned the Indictment on August 18, 2020.

The Government explains that it sought the Indictment in White Plains because at the time, "only one grand jury was sitting in the Manhattan courthouse and that grand jury was available only one day each week" because of the COVID-19 pandemic. (Government Br. at 1-2.) As a result of these pandemic-related constraints, "the Manhattan grand jury could not hear all the cases handled by the Manhattan division of the U.S. Attorney's Office," and ultimately "a number of cases" assigned to the Manhattan courthouse were heard by the grand jury sitting in White Plains. (Id. at 2.)

The jury-selection procedures in this District are governed by the 2009 Amended Plan for the Random Selection of Grand and Petit Jurors in the United States District Court for the Southern District of New York (the "SDNY Jury Plan").[1] The SDNY Jury Plan contemplates the creation of Master Jury Wheels and Qualified Jury Wheels. See SDNY Jury Plan art.

---

[1] The SDNY Jury Plan is available at https://nysd.uscourts.gov/sites/default/files/pdf/juryplan_feb_2009.pdf (last visited June 16, 2021).

2

III.A, IV.A. Consistent with their naming, the Master Jury Wheels include "master" lists of prospective jurors derived from voter-registration logs, while the Qualified Jury Wheels include "all persons who have been found qualified to serve as jurors." Id. Under the SDNY Jury Plan, the Master Jury Wheels "shall be emptied and refilled by not later than September 1 following the date of each Presidential Election." Id. art. III.B.

From among the Master Jury Wheels, qualified jurors are identified using "jury qualification questionnaires" sent to prospective jurors[2] once or twice a year, "or more frequently, if necessary." Id. art. III.D. Once returned, the questionnaires are "reviewed by the Clerk and finally evaluated by a district judge as necessary" to determine eligibility and inclusion in the Qualified Jury Wheels.[3] Id. Once a month, jurors from the Qualified Jury Wheels are summoned based on anticipated requirements for the coming month and then randomly assigned to grand or petit juries as

---

[2] "The number of names to be drawn shall be determined by the Clerk based upon anticipated juror demands for the ensuing six months." SDNY Jury Plan art. III.D.

[3] Certain prospective jurors are excused or deferred upon request based on "undue hardship or extreme inconvenience," including, for example, those who are responsible for the daily care of children under the age of twelve, or persons over seventy years old. Id. art.VI. Likewise, members of certain other groups are exempt, including, for example, active members of the Armed Forces and public officers of the government "actively engaged in the performance of official duties." Id. art. V.

3

needed. Id. art. III.F, IV.C.

Two courthouses comprise this district: Manhattan and White Plains. Master Jury Wheels and the Qualified Jury Wheels are created separately for each respective courthouse. The Manhattan courthouse draws from residents of New York, Bronx, Westchester, Putnam, and Rockland counties, and the White Plains courthouse draws from residents of Westchester, Putnam, Rockland, Orange, Sullivan, and Dutchess counties.[4] Id. art. III.C, IV.B. The proportion of jurors drawn from each county for the master wheels is the same as the proportion of registered voters in that county. See id. art. III.A, III.B.

The SDNY Jury Plan does not contain any rules regarding which courthouse should return a particular indictment or where cases should ultimately be assigned. Nor do the Rules for the Division of Business Among District Judges (the "SDNY Business Division Rules"), which provide that "[i]ndictments designated for Manhattan *may* be returned by the grand jury in open court to the magistrate judge presiding in the criminal part" and "[i]ndictments designated for White Plains *may* be

---

[4] Given that both the Manhattan and White Plains courthouses draw from Westchester, Putnam, and Rockland counties, the SDNY Jury Plan provides that jurors selected for service from those counties "shall be then divided between the Manhattan and White Plains Qualified Wheels" in such a way that "reflect[s] the relative number of registered voters in each county within the respective Master Jury Wheels." Id. art. IV.B.

4

returned by the grand jury to the magistrate judge presiding in the White Plains Courthouse." SDNY Business Division Rule 6 (emphasis added).[5] The SDNY Business Division Rules suggest, but nowhere require, that crimes committed in the northern counties be assigned to the White Plains courthouse. See SDNY Business Division Rule 18(b) ("The U.S. attorney designates on the criminal cover sheet that the case is to be assigned to White Plains if the crime was allegedly committed in whole or predominant part in the Northern Counties.") There is no parallel provision regarding the assignment of cases involving crimes allegedly committed in the southern counties.

As a result of the COVID-19 pandemic, "the majority of in-person proceedings throughout the Southern District of New York were suspended." United States v. Schulte, No. 17 CR. 548, 2021 WL 1146094, at *1 (S.D.N.Y. Mar. 24, 2021); see also Standing Order, M-10-468, Dkt. No. 20-mc-622 (S.D.N.Y. Apr. 20, 2020). The Government contends, and defense counsel does not dispute, that grand jury operations were also significantly limited. (See Government Br. at 1-2; Defense Br. at 3.) Thus, the Government obtained from the White Plains

---

[5] The Rules for the Division of Business Among District Judges is contained within the Local Rules of United States District Courts for the Southern and Eastern Districts of New York, available at https://www.nysd.uscourts.gov/sites/default/files/local_rules/rules-2018-10-29.pdf (last visited June 16, 2021).

5

grand jury certain indictments, like the one at issue here, for cases ultimately assigned to the Manhattan courthouse.

Like Charles, a number of criminal defendants throughout the district have challenged this practice on the grounds that it violates their right to juries comprised of a fair cross section of the community. These motions have been denied on grounds similar to those set forth below. See, e.g., United States v. Middlebrooks, No. 21 CR 89, 2021 WL 2402162 (S.D.N.Y. June 10, 2021) (citing recent cases); United States v. Segovia-Landa, No. 20 CR 287, 2021 WL 1966117 (S.D.N.Y. May 17, 2021); United States v. Tagliaferro, No. 19 CR 472, 2021 WL 1172502 (S.D.N.Y. Mar. 29, 2021); Schulte, 2021 WL 1146094.

B.  THE PARTIES' ARGUMENTS

Charles argues that "Black or African-American" and "Hispanic of Latino" jurors were significantly underrepresented on the White Plains grand jury that indicted him. He argues that his Sixth Amendment right to a jury comprised of a fair cross section of the community was violated because (1) Blacks and Latinos are a "distinct group," (2) they were significantly underrepresented on the White Plains grand jury regardless of the method and groups of comparison utilized, and (3) the underrepresentation was "systematic" insofar as it was part of a practice of pursuing

6

indictments from White Plains for cases assigned to Manhattan. Charles further contends that the underrepresentation was systematic because the SDNY Jury Plan is defective in that: (1) it gets refilled only every four years, (2) voter registration lists are its only source of prospective jurors, (3) inactive voters are excluded, and (4) errors in proration resulted in the exclusion of thousands of people from certain counties. Next, Charles argues that for the same reasons his Sixth Amendment rights were violated, his Fifth Amendment rights were also violated. Regarding the animus component of his Fifth Amendment claim, Charles contends that the degree of underrepresentation here is enough to support a prima facie case of discrimination and shift the burden to the Government to justify its jury selection methods. Charles lastly argues that the Government violated the JSSA by obtaining his indictment in White Plains instead of Manhattan, and that the exclusion of inactive voters and the alleged proration errors also violated the JSSA.

The Government counters that Black and Latino jurors were not underrepresented on Charles's jury when using the correct jury pool, the correct comparison group, and the "absolute disparity" model. The Government argues that for this reason, and because any alleged underrepresentation is

7

not "systematic," Charles's Sixth Amendment claim fails. According to the Government, the alleged underrepresentation is not systematic because each component of the jury-selection process that Charles challenges is not itself defective but only problematic when affected by "external forces." The Government further argues that Charles has not shown that each challenged component is responsible for the alleged disparities. On Charles's Fifth Amendment claim, the Government contends that Charles has neither established intentional discrimination, nor alleged sufficient underrepresentation to shift the burden to the Government. Even if the burden were shifted, however, the Government insists that the challenged jury-selection methods are all justifiable and have minimal impact. The Government lastly argues that Charles's JSSA claim fails because Charles has not established that any of the alleged violations have a significant impact on the jury pool, none violate the JSSA's requirements, and technical errors are not considered violations.

## II.   APPLICABLE LAW

A.   THE SIXTH AMENDMENT

The Sixth Amendment guarantees criminal defendants the right to a jury panel "drawn from a source representing a 'fair cross section' of the community." United States v.

8

Jackman, 46 F.3d 1240, 1244 (2d Cir. 1995) (quoting Taylor v. Louisiana, 419 U.S. 522, 536 (1975)). To establish a prima facie violation of the Sixth Amendment's fair-cross-section guarantee, a defendant must show:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

Duren v. Missouri, 439 U.S. 357, 364 (1979).

B.   THE FIFTH AMENDMENT

The Equal Protection Clause of the Fifth Amendment guarantees criminal defendants the right to a representative jury. Stated differently, the exclusion of minorities from grand and petit juries is forbidden under the Fifth Amendment. Castaneda v. Partida, 430 U.S. 482, 493 (1977). To establish a prima facie case of discrimination in jury selection under the Fifth Amendment, defendants must establish that:

> (1) there is a cognizable group, (2) that is substantially underrepresented by reason of (3) a selection procedure that is not racially neutral, i.e., is the result of intentional discrimination by the District.

United States v. Rioux, 97 F.3d 648, 659 (2d Cir. 1996). The underrepresentation of minorities on juries is unconstitutional under the Fifth Amendment "only if it is the

9

product of intentional discrimination." Alston v. Manson, 791 F.2d 255, 257 (2d Cir. 1986). In some cases, "clear statistical evidence may raise a presumption of intentional discrimination." Rioux, 97 F.3d at 659. In such cases, the burden then shifts to the Government to "supply a plausible justification for the method of selecting jurors." United States v. Johnson, 21 F. Supp. 2d 329, 338 (S.D.N.Y. 1998) (citing Castaneda, 430 U.S. at 496 n.17; Alston, 791 F.2d at 258).

C.   THE JSSA

The JSSA establishes that all criminal defendants "shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes." 28 U.S.C. § 1861. The JSSA "goes beyond prohibition of 'intentional' distortions and provides that in certain cases affirmative measures must be undertaken to insure that 'juries [are] selected at random from a fair cross section of the community.'" United States v. Fernandez, 480 F.2d 726, 733 (2d Cir. 1973) (citations omitted); see also 28 U.S.C. § 1863(a) ("Each United States district court shall devise and place into operation a written plan for random selection of grand and petit jurors that shall be designed to achieve the objectives."). "[T]he Duren test governs fair cross section challenges under both the [JSSA]

10

and the Sixth Amendment." United States v. LaChance, 788 F.2d 856, 864 (2d Cir. 1986).

### III. DISCUSSION

A. THE SIXTH AMENDMENT

The parties do not dispute that Charles has satisfied the first prong of the Duren test. "Unquestionably," Blacks and Latinos are "distinctive" in the community. Rioux, 97 F.3d at 654 ("Rioux has satisfied the first element of the Duren test: Blacks and Hispanics are unquestionably 'distinctive' groups for the purposes of a fair-cross-section analysis." (citation omitted)).

The parties do dispute, however, whether Charles has satisfied the second and third elements. The Court is not persuaded that Charles has satisfied the second element of systematic exclusion. As a result, the Court need not address the third element of the Duren analysis. See, e.g., Middlebrooks, 2021 WL 2402162, at *3 (because the defendant failed to satisfy the third element, "[t]he Court does not need to evaluate the second Duren factor of underrepresentation").

To establish systematic exclusion, a defendant must show that "the underrepresentation is due to the system of jury selection itself, rather than external forces." Rioux, 97 F.3d at 658. In other words, "systematic exclusion does not

11

occur simply because a facially neutral disqualification criterion disproportionately impacts a particular group." United States v. Barlow, 732 F. Supp. 2d 1, 40 (E.D.N.Y. 2010), aff'd, 479 F. App'x 372 (2d Cir. 2012). Thus, when the cause of exclusion "is an external force, not an inherent flaw within the Jury Plan," any underrepresentation is not "systematic." Tagliaferro, 2021 WL 1172502, at *4.

Here, each component of the SDNY Jury Plan that Charles challenges is "facially neutral" and only creates underrepresentation, if any, to the extent the component is affected by "external forces." For example, Charles challenges the Government's decision to indict him in White Plains rather than Manhattan. But Charles does not dispute that this decision arose as a result of the COVID-19 pandemic -- *not* an inherent problem with the SDNY Jury Plan. See Schulte, 2021 WL 1146094, at *8 (concluding that the decision to indict in White Plains because of "the COVID-19 pandemic and its substantial curtailment of in-person proceedings throughout the District" was an "external forces" and did "not establish systematic exclusion"); see also Tagliaferro, 2021 WL 1172502, at *5 ("[U]nfortunate as these effects may be, one cannot seriously dispute the fact that the COVID-19 pandemic is an external force.").

Next, Charles challenges the SDNY Jury Plan's method of

12

replenishing the master wheels only once every four years. (See Defense Br. at 6.) Again, however, even Charles acknowledges that this four-year replenishment period does not itself create underrepresentation. Charles explains that the four-year cycle results in exclusion because younger jurors and those who move "are excluded towards the end of the life of the wheel," and Black and Latino people "are disproportionately represented in age groups 18, 19, and 20," and "move at a higher rate." (Id.) That may be, but moving tendencies and people's ages are external forces. These external forces undermine Charles's argument that the four-year replenishment cycle is itself defective.[6] See Schulte, 2021 WL 1146094, at *8 (concluding that the four-year replenishment cycle does not constitute systematic exclusion because "the true cause of the exclusion -- younger people moving more often -- is an external force, not a systematic defect inherent in the Jury Plan" (citing Rioux, 97 F.3d at

---

[6] To the extent Charles argues that this method is further defective because of "the failure to update addresses or remail juror questionnaires following a lack of return" (Defense Br. at 13), the Court is unpersuaded that this practice constitutes a systematic defect in the SDNY Jury Plan. Much like the Court "cannot charge the District's Jury Plan with a Sixth Amendment violation because of how often people move residences throughout the District," the Court cannot charge a Sixth Amendment violation based on people's choice not to return the questionnaire or the undeliverability of their mail. See Schulte, 2021 WL 1146094, at *8; Rioux, 97 F.3d at 658 ("The inability to serve juror questionnaires because they were returned as undeliverable is not due to the system itself, but to outside forces, such as demographic changes.").

13

658)).

Third, Charles argues that the use of voter-registration lists constitutes systematic exclusion. But as the recent cases in this district have held, this argument is foreclosed by the Second Circuit's decision in Schanbarger v. Macy. 77 F.3d 1424, 1424 (2d Cir. 1996) ("[A] jury venire drawn from voter registration lists violates neither the Sixth Amendment's fair cross-section requirement nor the Fifth Amendment's guarantee of Equal Protection." (citations omitted)); see also United States v. Biaggi, 909 F.2d 662, 677 (2d Cir. 1990) (affirming the district court's finding that "use of the voter registration list as the sole source of prospective jurors had not been shown to deprive the Jury Plan of racial neutrality or render it susceptible to abuse").[7]

Fourth, Charles argues that the exclusion of inactive voters in certain counties constitutes systematic exclusion. However, Charles acknowledges that "definite conclusions

---

[7] The Court acknowledges that such claims are not categorically foreclosed. The practice is unconstitutional when the lists are generated using "suspect voter-registration qualifications." Barlow, 732 F. Supp. 2d at 41 (citing Truesdale v. Moore, 142 F.3d 749, 755 (4th Cir. 1998) ("The use of voter registration lists 'has been consistently upheld against both statutory and constitutional challenges, *unless the voter list in question had been compiled in a discriminatory manner*.'" (citations omitted))); see also Schanbarger, 77 F.3d at 1424 (holding that reliance on voter-registration lists is valid "absent positive evidence that some groups have been hindered in attempting to register to vote").

14

cannot be drawn regarding the[] race and ethnicity" of the excluded inactive voters. (Defense Br. at 15.) Moreover, even assuming Charles had established that underrepresentation results from the exclusion of inactive voters, "[v]oters are moved to inactive status when a County Board receives information indicating that a voter may no longer be living at her address of registration." Common Cause/New York v. Brehm, 432 F. Supp. 3d 285, 290 (S.D.N.Y. 2020). In other words, voters become "inactive" when they move, which constitutes an external force and undermines finding a violation. See Schulte, 2021 WL 1146094, at *8 ("[T]he Court cannot charge the District's Jury Plan with a Sixth Amendment violation because of how often people move residences throughout the District.").

Lastly, Charles challenges the SDNY Jury Plan based on errors in proration, which allegedly resulted in the exclusion of 285,347 registered voters for the White Plains Master Jury Wheel. Charles argues that this mathematical error "systematically excludes Black of African American and Hispanic of Latino persons." (Defense Br. at 16 (citing Martin Decl. ¶ 83).) However, Charles has not established how this error is responsible for the underrepresentation he alleges. See Schulte, 2021 WL 1146094, at *8 n.10 (rejecting the argument that overlapping counties were inequitably prorated

15

because the defendant "has not shown that this alleged error caused the underrepresentation at issue"); see also Berghuis v. Smith, 559 U.S. 314, 332 (2010) (a defendant does not make out a prima facie case "merely by pointing to a host of factors that, individually or in combination, *might* contribute to a group's underrepresentation").

B.   THE FIFTH AMENDMENT

Charles's Fifth Amendment claim fails because he cannot establish "proof of discriminatory intent." Biaggi, 909 F.2d at 677. As various courts in this district resolving nearly identical motions have held, "disparities due to reliance on voter registration lists [do] not evidence intentional discrimination." Allen, 2021 WL 431458, at *11. Likewise, intentional discrimination is not established by "clerical errors used in process[ing] alternate addresses, removal of 'inactive' voters, [or] the decision to update the master wheel every four years." Id. (quoting Biaggi, 680 F. Supp. 641 at 652). This is because "[a]ll of these alleged issues are facially race-neutral and their impact on the racial composition of the wheels is n[ot] inevitable." Id. (citing Biaggi, 680 F. Supp. 641 at 652 (holding that the defendants' Fifth Amendment claim failed because it was not "ineluctable" that the challenged jury selection plan would result in underrepresentation)).

16

"While it is true that clear statistical evidence may raise a presumption of intentional discrimination in some cases, this presumption may be rebutted by the government." Rioux, 97 F.3d at 659. Even assuming such statistical evidence exists here, the Government has sufficiently rebutted any presumption of discriminatory intent. See Johnson, 21 F. Supp. 2d at 338 (explaining that the government rebuts the presumption by "supply[ing] a plausible justification for the method of selecting jurors" (citations omitted)).

The Government's expert provided counter-data suggesting that much of the alleged disparities resulted not from the challenged selection practices, but rather disparities in the qualification, exemption, and excusal of potential jurors. (See Siskin Aff. ¶ 37.) Charles does not challenge these aspects of the SDNY Jury Plan. Moreover, the Government argues that the decision to indict Charles in White Plains during the COVID-19 pandemic because of the limited availability of grand jurors in Manhattan is -- like the decisions to draw prospective jurors from voter-registration lists, update those lists every four years, and exclude "inactive" voters from the lists are -- supported by plausible justification. Having considered the Government's arguments, which are similar to those accepted by other courts in this District, the Court finds the Government's justifications plausible.

17

See, e.g., Schulte, 2021 WL 1146094, at *6; United States v. Segovia-Landa, No. 20 CR 287, 2021 WL 1966117, at *3 (S.D.N.Y. May 17, 2021).

C.   THE JSSA

Fair-cross-section challenges brought under the JSSA are also analyzed using the Sixth Amendment's Duren test. See LaChance, 788 F.2d at 864. Thus, because his fair-cross-section challenge fails under the Sixth Amendment, Charles's JSSA challenge also fails. See id. ("[B]ecause the Duren test governs fair cross section challenges under both the [JSSA] and the sixth amendment, our discussion of the statutory challenge also disposes of his constitutional claim.").

To the extent Charles separately argues that the Government failed to comply with the JSSA, that claim is meritless. Charles argues that the JSSA was violated by (1) the Government's decision to seek indictment in White Plains, (2) the exclusion of inactive voters, (3) the erroneous proration of counties, and (4) the exclusion of individuals who provided alternate mailing addresses when registering to vote in Dutchess, Orange, Putnam, and Sullivan counties. (See Defense Br. at 20-22.)

As to Charles's challenge to the Government's decision to seek indictment in White Plains, the Court is unpersuaded that this decision violated the JSSA by depriving Charles of

18

jurors "residing in each of the counties." (See Defense Br. at 20.) "It is well-settled that neither the jury selection statute nor the Constitution requires that jurors be drawn from an entire district." United States v. Bahna, 68 F.3d 19, 24 (2d Cir. 1995).

The Court finds that Charles's remaining allegations set forth nonactionable "technical violations" at best, and "[m]ere technical violations of the procedures prescribed by the Act do not constitute substantial failure to comply with its provisions." LaChance, 788 F.2d at 870 (internal quotation marks and citations omitted); see also Allen, 2021 WL 431458, at *10-11 (explaining that the exclusion of inactive voters, improperly transcribing alternate addresses, and improper prorating of voters would at most be technical violations). "A substantial violation of the [JSSA] occurs only when the alleged violation frustrates the Act's principles of random selection." Rioux, 930 F. Supp. at 1580-81. Charles has not established that any of the alleged technical violations of the JSSA rise to this level. E.g., Schulte, 2021 WL 1146094, at *9-10 (rejecting a JSSA challenge on similar grounds).

## IV.  ORDER

Accordingly, for the reasons set forth above, defendant Miles Charles's motion to dismiss the indictment (Dkt. No.

25) is **DENIED**.

**SO ORDERED:**

Dated:   New York, New York
         16 June 2021

_____
Victor Marrero
U.S.D.J.